## STATE v. NAPOLEON SPENCER.

(Filed 30 October, 1918.)

**1. Homicide—Evidence, Circumstantial.**

Where the prisoner, tried for a homicide, denies that he was present at the time, the State may show that he was present by circumstantial evidence, which, in this case, is held sufficient to be submitted to the jury.

**2. Evidence—Maps—Homicide.**

A witness may use a map of the premises where a homicide has been committed to explain and illustrate his evidence relevant to the guilt of the prisoner charged with the crime, when restricted to that purpose.

**3. Evidence—Corroboration—Identity.**

Where the accused has denied that he was present when the homicide, by shooting, had been committed, and a witness has testified as to his identity that he was a man she had seen leaving the locality soon thereafter, with further testimony that he was the same person who had shot at a dog on the road, such evidence is competent in corroboration of his identity as the one who committed the homicide, and also as to the fact that he had a pistol at the time.

**4. Evidence—Homicide—Natural Evidence.**

Where the appearance of a dog, as it returned home after being shot at by the prisoner accused of a homicide, is relevant to the inquiry, testimony as to his conduct is natural evidence, and an instantaneous conclusion of the mind from a variety of facts observed at the same time in regard to it is competent, under the doctrine of *S. v. Leak*, 156 N. C., 643, cited and applied.

**5. Appeal and Error—Evidence—Unanswered Questions.**

Where the answer to a question, objected to and excluded, was not given, it must be made to properly appear on appeal that the evidence sought would have been of material value to the appellant, so that the court may see that its exclusion has been prejudicial to him.

**6. Evidence—Homicide—Identity—Opinion.**

It is competent for a witness to give his impression or opinion as to the identity of the prisoner with a man she saw fire a pistol at a dog, from what she saw and knew of him theretofore, when relevant to the inquiry, upon the trial for a homicide.

**7. Evidence—Corroboration—Statements to Others—Witnesses.**

A witness may testify, in corroboration of his statements on the stand, that he had made the same or similar statements to other persons.

**8. Evidence—Homicide—Footprints.**

With other evidence tending to convict the prisoner of a homicide, it may be shown that his shoes fitted the footprints leading from the place of the crime, as a circumstance tending to show identity, its value as proof being greater or less, according to circumstances.

**9. Evidence—Identification—Homicide—Clothes—Questions for Jury.**

Where the prisoner, accused of homicide, has denied that he was at the place of the crime when it was committed, and there is evidence that a

man was then seen leaving the place wearing a white scarf, testimony that the sheriff had referred to the prisoner's wearing a white scarf, in his presence, without his denial, is competent; and as to whether the prisoner understood that it referred to the time of the homicide, or subsequently thereto, under the evidence in this case, was properly submitted to the jury, with correct instructions as to its bearing upon the case.

**10. Evidence—Identification—Homicide—Reformatory.**

Where a witness has testified that the prisoner on trial for a homicide was the same as a man she saw in a reformatory, it is competent to show that only one man with the prisoner's name had been in that reformatory, for the purpose of identification, in connection with the other and pertinent evidence in the case tending to show his guilt.

**11. Evidence—Contradiction—Circumstance—Homicide.**

Where the prisoner, on trial for homicide, denied he was at the place at the time of its commission, and has contradicted himself as to where he then was, stating among other things that he was at a certain theater, testimony of the owner of the theater in contradiction is competent as a circumstance to be considered by the jury.

**12. Homicide—Murder—Evidence—Deadly Weapon—Manslaughter—Mitigation—Burden of Proof—Instructions.**

Where the evidence tends to show that the homicide was committed with a pistol, fired by the accused three times, each shot taking effect, and that he shot the husband of the deceased as he afterwards approached the house, without evidence in his behalf tending to reduce the crime to manslaughter, and his sole defense was that he was not there at the time and consequently could not have committed the crime, with sufficient circumstantial evidence to convict him of it, there is no element of manslaughter in the case, and an instruction to the jury to that effect is proper.

**13. Instructions — Contentions — Objections and Exceptions — Appeal and Error.**

Misstatements made in the charge of the judge as to the contentions of the parties will not be considered on appeal when not called to the attention of the court at the proper time for him to correct them.

INDICTMENT for murder, tried before *Shaw, J.,* and a jury, at May Term, 1918, of SURRY.

The prisoner was charged with the murder of Mrs. Alva Hester, which is alleged to have been committed in Forsyth County on 5 March, 1918. The case, upon motion and affidavit of the prisoner, was removed to Surry County for trial.

It was not denied by the prisoner that Mrs. Hester was killed at the time stated, about 5:30 o'clock in the afternoon of Tuesday, 5 March, 1918, but he contended that he was not there at the time and took no part in the homicide. There is evidence tending to show that almost immediately after the reports of the pistol were heard, a man was seen going over a knoll, about 25 yards from the house where the Hesters lived. He was not recognized at the time, but the witness, James

Stanly, stated that he wore a dark suit and there was something white around his neck, above his coat. He did not see him well enough to know who he was. Further evidence tended to show that the prisoner was seen the same afternoon in that neighborhood, and walking in the direction of the house, and wearing a dark cap and coat, and having something white around his neck, and something over his face, so that you could not see it. He also had on goggles. John Ford, one of the witnesses, saw him pass when going in the direction of the Hester home, and his tracks were traced from that place to the Hester house, and a shoe put in his tracks which was found to fit it. The same evening, after the homicide had been committed, he was seen to come out of the woods and from the general direction of the Hester place. He returned to his home, and his mother stated to Mrs. Bean, her language being, "That's my boy, coming from his work, but that's a funny way for him to come from his work." He came in the back way from the direction of the Shady Mount schoolhouse. He was arrested in his room that very evening, and the goggles, clothes, overalls, scarf, and pistol were found there. He was in bed when the officers went to his home. He was asked where his pistol was, and replied that it was downstairs in his mother's room, but the officers turned up his pillow and found the pistol, which was of 38 caliber. The goggles were found behind the bed, where the ceiling and weather-boarding stopped. The warrant was read to him, charging that he had carried a concealed weapon—a pistol—to Mrs. Daniels, when he said that he was not the man, as the Hanes Knitting Mill, where he worked, did not close until 5:30 p. m. He was taken by the officers to Mr. Boyd's, where he was identified by certain witnesses as the man they had seen that afternoon. There was evidence contradicting his statements as to where he was during the afternoon when Mrs. Hester was killed. He had quit his work at the mill about noon and did not return in the afternoon of that day, though he had said that he could not have been at the Hester house at 5:30 p. m., the time of the homicide, because the mill did not close until 5:30 o'clock p. m. While in jail he was asked why there was blood on his handkerchief and on his overalls, and he replied that his nose had bled and he used his handkerchief. The officers found another handkerchief in his pocket with blood on it, and still another, and he gave the same explanation as to each one of them, and added that the blood from his nose had dripped on his overalls. On one of the handkerchiefs there was a spot that looked like burnt powder, and when questioned about it he stated that he had a dog and wanted him to bite, and had fed him with powder for that purpose.

There was other evidence tending, more or less, to connect the prisoner with the commission of the homicide, but it need not be stated, in the view taken of the case, except to say that when the body of Mrs. Hester

was found she was lying on her back in the room and was covered with blood, which was fresh. As Mr. Hester was coming to the house, after hearing the report of the pistol, he was shot in the head when near the house.

The jury found the prisoner guilty of murder in the first degree, and from the judgment upon the verdict he appealed.

*Attorney-General Manning and Assistant Attorney-General Nash for the State.*

*J. S. Fitts and Jones & Clement for defendant.*

WALKER, J., after stating the case: It cannot be well doubted that there was ample evidence of the prisoner's guilt. The evidence, it is true, was circumstantial, but sufficiently strong for submission to the jury, and the court clearly and fully explained in its instructions the nature of such evidence and what was required to make it sufficient for a conviction. The charge was altogether favorable to the prisoner, and his rights were carefully guarded in every respect, and there is no ground upon which any objection to it can securely rest, though we will later on notice one or two exceptions taken to it.

Exceptions were entered to several rulings of the court upon evidence, and other matters, which we will consider in the order of their assignment.

1. The court permitted the witness, J. T. Thompson, to use a map of the premises where the homicide occurred, to explain and illustrate his testimony, and it was used for no other purpose, the court restricting it to that special purpose. We have often held that maps and diagrams are competent for the purpose of enabling a witness to explain his testimony, so that the jury may understand it. *S. v. Wilcox,* 138 N. C., 1120; *S. v. Rogers,* 168 N. C., 112; Wharton's Ev. in Cr. Cases, p. 1116, sec. 537a.

2. The testimony of the witness, J. W. Daniel, as to the man shooting at his dog near his home, was competent as some evidence of the prisoner's identity and of the fact that he had a pistol, and this is true when this testimony is read in connection with that of Mary Walker, who was walking behind the man who shot at the dog, and who testified that it was the prisoner, as she thought at the time. The appearance of the dog as he returned to the house was natural evidence. "The instantaneous conclusions of the mind as to appearance, condition, mental or physical state of persons, animals and things, derived from observation of a variety of facts presented to the senses at one and the same time, are, legally speaking, matters of fact and are admissible in evidence." *S. v.*

*Leak,* 156 N. C., 643; *Renn v. R. R.,* 170 N. C., 128. Within this rule, the opinion of the witness as to the appearance of the dog and his conduct was permissible.

3. The question asked the witness, J. W. Daniel, which was excluded on objection of the State, was, of course, not answered, and it did not appear what, the answer would have been. It might have been unfavorable to the prisoner, in which case his objection would have failed, as he could gain nothing by such an answer and was deprived of no beneficial testimony. *McMillan v. R. R.,* 172 N. C., 853.

4. The testimony of Mary Walker as to the identity of the man she saw near J. W. Daniel's house when the pistol was fired and the dogs barked and were frightened away, was competent. She could give her impression or opinion as to who he was, from what she saw, as she knew him before. "Opinion, so far as it consists of a statement of an·effect produced on the mind, becomes primary evidence, and hence admissible whenever a condition of things is such that it cannot be reproduced and made palpable in the concrete to the jury. Eminently is this the case with regard to noises and smells, to questions of identification, where a witness is allowed to speak as to his opinion or belief, and to the question whether a party believed himself at the time to be in great danger of death." Wharton's Ev. in Cr. Cases, sec. 459, p. 962.

5. It was competent, as corroborative of Otis Ross' testimony, to show that he had made to other persons statements similar to those he made on the witness stand, and this may be shown by his own testimony. *S. v. Rowe,* 98 N. C., 629, and cases cited; *S. v. Whitfield,* 92 N. C., 831.

6. The testimony as to the fitting of the shoe to tracks found where the prisoner had been seen was admissible, as it was a circumstance tending to show identity. *S. v. Graham,* 74 N. C., 646; *S. v. Lowry,* 170 N. C., 730. This is "real" evidence, as called by the civilians, and its value as proof is greater or less, according to the circumstances. Best on Evidence, sec. 183; *S. v. Lowry, supra.* It is some evidence tending to identify the prisoner as the perpetrator of the crime. There was sufficient proof that the tracks were those of the prisoner to warrant the admission of this evidence as to the correspondence between the tracks and the prisoner's shoes.

7. The allusion of the sheriff to the white scarf was not admitted to show that it was the one the prisoner wore around his neck when the witness, James Stanly, saw him "with something white above his coat," but as the prisoner was silent when this was said in his presence and hearing, and it was equivalent to charging that he had committed the murder, it was some evidence of the fact. He was permitted to explain it by saying that he thought they were referring to the charge of carrying a concealed weapon at Mr. Daniels' when he wore a white handker-

chief; and the judge, in commenting on this evidence, most carefully and minutely explained it to the jury, and the effect of it in the case, and told the jury that if they found that the prisoner's statement was true, and that he did not understand that the sheriff was referring to the homicide, they should utterly reject this evidence and not permit it to have any influence in making up their verdict. The prisoner's rights were thus sufficiently protected.

8. The testimony as to the prisoner having been an inmate of the reformatory was restricted to the purpose of identification of him as the man who was walking in the direction of the Hester home. One witness, Mary Walker, has testified that the man she saw was the Spencer who had been in the reformatory; and, to show who this was, it was competent to prove that the prisoner was the only man by the name of Spencer who had been confined there. It was the normal and logical way to prove the other fact.

9. This exception was taken to testimony of Mr. Craven, who was the manager of Rex Theater. The prisoner had been told by J. A. Thomas, chief of police of Winston-Salem, that they had investigated as to his whereabouts in the afternoon of the day when Mrs. Hester was killed, and discovered that he was not at the Hanes Mill at that time. The prisoner then admitted that he was not there, but left the mill about 1 o'clock and went to his home, and afterwards, the same afternoon, to Mr. Craven's theater. Mr. Craven was introduced to show that the prisoner was not at his theater, and his testimony was clearly competent for this purpose. The flat contradiction of himself was some evidence of his guilt, and the contradiction by Mr. Craven was also a circumstance to be considered by the jury. *S. v. Swink,* 19 N. C., 9; *S. v. Rowe,* 98 N. C., 629.

10. There was no element of manslaughter in the case, and the court was right in so stating to the jury. The homicide had more the appearance of a willful and deliberate murder, with no excusing, extenuating or palliating circumstance. The question was not as to the degree of the crime, but as to who was its perpetrator. The learned judge charged the jury as to murder in the second degree, and the prisoner got the full benefit of this proper instruction, but it is impossible to see in what consisted the element of manslaughter. Whoever it was fired three times at Mrs. Hester, each ball taking effect, two of them lodging in her breast, and then the husband as he approached the house, was shot down by the same person. It was not a sudden altercation, nor was there any legal provocation or any other fact or circumstance which, if found by the jury, could in law reduce the grade of the crime to manslaughter. The slayer went there to steal, or perhaps to commit some other felony, and

to kill if discovered and resisted. *S. v. Logan,* 161 N. C., 235; *S. v. Lane,* 166 N. C., 333. The burden of reducing the crime from murder in the second degree to manslaughter was upon the prisoner, and there is no evidence that would have warranted a verdict of manslaughter. We said, in *S. v. Lane, supra:* "The instruction, that if the prisoner intentionally killed the deceased with a deadly weapon, to wit, a gun, the law implied malice, and the prisoner would be guilty of murder in the second degree, is well sustained by the cases. In all indictments for homicide, when the intentional killing is established or admitted, the law presumes malice from the use of a deadly weapon, and the defendant is guilty of murder (now in the second degree), unless he can satisfy the jury of the truth of facts which justify or excuse his act or mitigate it to manslaughter. The burden is on the defendant to establish such facts to the satisfaction of the jury, unless they arise out of the evidence against him. This rule has been uniformly adhered to by this Court in indictments for homicide. *S. v. Quick,* 150 N. C., 820. This principle has been reiterated by us in more recent cases." *S. v. Worley,* 141 N. C., 764; *S. v. Yates,* 155 N. C., 450; *S. v. Rowe, ibid.,* 436; *S. v. Simonds,* 154 N. C., 197; *S. v. Cox,* 153 N. C., 638; *S. v. Fowler,* 151 N. C., 731; and formerly in *S. v. Clark,* 134 N. C., 698; *S. v. Brittain,* 89 N. C., 481. To these may be added *S. v. Davis,* 175 N. C., 723.

11. We do not think there was any misstatement of the contentions of counsel in the charge, but if there had been it should have been called to the attention of the court at the proper time, so that it might be corrected. *S. v. Blackwell,* 162 N. C., 672; *S. v. Martin,* 173 N. C., 808; *S. v. Burton,* 172 N. C., 939.

We may conclude with what was stated by *Judge Gaston* in *S. v. Swink,* 19 N. C., 9 (and reiterated in *S. v. Rowe,* 98 N. C., 629), which seems to be applicable to this case: "All the surrounding facts of a transaction may be submitted to the jury when they afford any fair presumption or inference as to the question in dispute. Upon this principle it is that the conduct of the accused at the time of the offense or after being charged with it, such as flight, the fabrication of false and contradictory statements, the concealment of the instruments of violence, the destruction or removal of proofs tending to show that an offense had been committed or to ascertain the offender, are all reviewable in evidence as circumstances connected with and throwing light upon the question of imputed guilt."

We are of opinion that the jury could fairly deduce, beyond any reasonable doubt, the guilt of the prisoner, as there was ample proof to warrant such a finding after applying most strictly, as the presiding judge did in this case, the rule as to circumstantial evidence.

The record discloses no error in the trial.

No error.