SEAWELL, J., dissents.
Criminal prosecution upon indictment charging that defendant, late of Caldwell County, on 22 April, 1947, with force and arms, at and in the said county, feloniously, willfully, and of his malice aforethought, and with premeditation, did kill and murder one Thomas J. Oliver, contrary to the form and the statute in such case made and provided, and against the peace and dignity of the State.
Defendant entered plea of not guilty.
Upon the calling of the case for trial, the Solicitor for the State announced in open court that he would not ask for a verdict against the defendant of guilty of murder in the first degree, but would ask for a verdict of guilty of murder in the second degree, or manslaughter, as the facts and law may warrant.
The evidence offered upon the trial by the State, as set out in the record on this appeal, tends to show this narrative of events and circumstances at and about the date of, and in connection with the alleged homicide of Thomas J. Oliver, with which defendant Carl Coffey is charged:
Thomas J. Oliver, called Tom Oliver, resided with his wife, a son, Tom, Jr., and two daughters, Ruth, an adult, and Marceline, of teen age, in a house located on the county line between Burke and Caldwell Counties, North Carolina, about 300 to 400 yards to the left of the highway from Lenoir to Morganton, in a community thickly populated on both sides of the highway in directions of both Lenoir and Morganton. The highway was much used, and traveled day and night by trucks and other vehicles. A private road ran from the highway at the county line to the Oliver house. There was also an old road from the highway which ran in the direction of the Oliver house, and around the field. Between the house and the highway there was a patch of woods, — a V-shaped piece of woodland. This house was about one-half mile from the house *Page 121 
in which defendant resided, and about the same distance from the home of Eldridge Cannon. Defendant's home was about one-fourth mile from the Cannon home, and on the same old road that it is. Defendant had been buying milk from the Olivers, and would come to the Oliver house to pay for it.
On Monday night, 21 April, this year, Tom Oliver, with the assistance of his son Tom, Jr., transferred from his crib to a wagon "between 20 and 25" pasteboard cartons of whiskey, and "moved wagon and all" down below the house, next to the steep bank, out in the edge of the woods, near the old road, and left the whiskey on the wagon. Tom, Jr., testified: "Dad and I stayed with it Monday night . . . April 21st, the night before he was killed." Tom Oliver had his gun that night. Tom, Jr., left home to go to his work at factory in Lenoir about 6 o'clock, and was not at home on the afternoon of April 22nd, — but "went home about 11:20."
Tom Oliver was at his home, says his daughter Ruth, until 2 o'clock that day when he picked up the ax and went down in the woods. About that hour his wife, who was at home, saw him and defendant coming down through the woods. She says, "They walked to the wagon and stopped and were talking." They were "up there" about 4 o'clock when the younger daughter came home from school. Later, between 6 and 6:30 o'clock, the two daughters went out there in the woods to get the ax and to call their father to supper. At that time he and defendant were sitting on a log out in the woods, talking. The older daughter testified: "I saw somebody talking with him above the wagon, but I didn't recognize the person. It was just a short distance above. It was more than one person. There was just one person with Father, a man." She also testified that she knows defendant, and that she saw a person around the house that day, but was not close enough to recognize who it was. When the daughters called him to come to supper, Tom Oliver said "OK." The younger daughter saw the Oliver shotgun out there under the wagon — "but the older one did not see it." Both of them saw cartons of whiskey out there. They got the ax off the wagon, and went back to their house. The younger daughter also testified: "Daddy looked like he was drinking some, and Carl Coffey, too"; and that as she was going toward the house, quoting her, "I heard Daddy crying and I heard Carl Coffey laughing, — it sounded like. Daddy was crying. I do not know whether Carl Coffey was laughing or what . . . I was out in the front yard and I could see them." Tom Oliver was "drinking some" when he came to supper, about 6:30 o'clock, — about "dusky dark," in the language of his wife. He stayed 20 minutes to half an hour and "went back out there . . . about 7:30 o'clock." That was the last time his wife and daughters saw him, they testified. *Page 122 
The next morning, Wednesday, about 5:30 o'clock, Tom Oliver, Jr., found his father below the wagon. He was in a dying condition, lying there with "his head beat up," and "kind of down hill," "bleeding and not conscious." Blood had run down on his face and off and puddled on the ground, — about two feet long and one foot wide, and had congealed, — "clotted and kind of dried around the edges." His body was stiff. He died in the course of an hour or so, without regaining consciousness. There were four lacerations on his skull, (1) outside and above the left eye, (2) just above and behind the left ear, (3) along the crest of the left upper head, and (4) on top of the head, behind. His skull and lower jaw were fractured. In the opinion of medical expert these wounds were inflicted by some "blunt typed instrument," and the fracture of the skull caused his death. "His head had been cleaned up when I saw him," the doctor testified. The body was then at a funeral home.
At the time Tom Oliver was found on Wednesday morning the wagon was in the place it had been left Monday. His shotgun had been broken in two. The stock of it was on the ground about one and a half to two feet from his head, and the barrel, with trigger attached, was up in the leaves about four feet from the body, according to his son, Tom, Jr., and was down the hill below the wagon, on the old road about fifty feet from the body, according to Hallyburton, a neighbor, and the officers. There was an empty shell in the barrel. When Officer Duckworth picked it up with his handkerchief on the trigger, "it looked like blood on the barrel," he says. Duckworth also testified: "I took the gun barrel and stock with me. I put it in my car and carried it to Morganton," and he later turned it over to Officer Coble of Caldwell County, who says that then sticking to the gun hammer there was some "lint identical to the lint that was on Mr. Oliver's light felt hat. The hat . . . had blood . . . on the side that was lying in the edge of the puddle of blood." (Both the stock and the gun barrel were offered in evidence). At the point where Tom Oliver was lying there was no evidence of scuffling, but down where the gun barrel was found, fifty feet away, "the leaves and stuff had been torn up like a scuffle had taken place." At the time and place there were cartons of whiskey of the same kind as those on the wagon Monday night. Some were stacked up on the wagon, or beside it, or above it, and covered up with "old quilts and things," and some were scattered around up in the woods. About eight cases were broken open, and scattered and uncovered in the woods. Some of it had fallen out in the leaves. The witness Hallyburton says it looked like there were 18 to 20 cases. The officers took possession of the whiskey — but "didn't count the cases."
Defendant, according to testimony of Eldridge Cannon and his wife, came to the Cannon home "that night, April 22nd, between 8:30 and 9 o'clock." His wife came ten or fifteen minutes before he did. He came *Page 123 
to the window and called Cannon "to come out there." He said he was shot and wanted Cannon to take him to a doctor. "He seemed to be pretty drunk. He stumbled in the door and fell on the floor." He had a double-barrel shotgun, and set it down in the corner and stated that there were not any shells in it, — saying, "My wife hid the shells." His left pants' leg was bloody. Cannon asked him to pull up his pants' leg to see how bad he was shot, and he did so. "Blood was on his leg half way between his ankle and knee . . . and a hole about like a small shot or probably like a nail would make." He wanted Cannon "to go and get the doctor and get some liquor." "He said there was some liquor near the county line, and he wanted to get the Law and wanted the Law to clean up that liquor business. He said he went down to Mr. Oliver's . . . that he met up with Mr. Oliver at the mail box, and that Mr. Oliver wanted him to come out and talk to him, said he was guarding some liquor, and he said he went out there and talked to him a while, and that when he started to leave, somebody shot him . . . that after he walked about 30 steps from the wagon somebody shot him," — saying "he didn't know who shot him." His wife asked him if it was Mr. Oliver who shot him, and he said no, he didn't think so. Upon Cannon declining to go and "get the Law," defendant said he would see if he could get somebody else, and got up and went out, but did not take his gun. After about five minutes he came back, and again wanted Cannon to take him to the doctor, — and to get the Law. After Cannon examined his leg, he fell down on the floor. He said he had lost a lot of blood and was weak, — but he got up, and sat in a chair. Mrs. Cannon gave him some coffee, and after drinking several cups, he appeared to be more sober than before. "He got to talking," according to testimony of Cannon, "and said the same thing over and over until just before he left . . . said there were 30 cases of whiskey down there at first, and then later said there were 40, and about 11 o'clock, just before he left, he told us that Mr. Oliver was shot down there. He said, `You don't believe it. You don't believe that, do you?' My wife said he probably was, that it could be so, and he said, `Well, he is. They shot him. I stepped over his body,' and he said, `Mr. Oliver called to me and said "I am shot. I am dying,"' and he said, `You don't believe that, do you?' . . . `If you don't believe it, I will take you down there and show you; do you want to go?' I told him no, that I didn't want to get mixed up in it. He did not tell me who `they' were, he just said `they.' He cursed . . . said `Those G__ d___ s.o.b.'s shot me.' He said he did not know who shot Mr. Oliver . . . He only told me who Mr. Oliver told him the liquor belonged to. He told me that just before he left the second time. He was cursing pretty big . . . It was about two hours from the time he came there when he told me that Mr. Oliver had been shot. He did not say a word about Mr. Oliver molesting *Page 124 
anybody . . . He said Mr. Oliver was dead . . . After he left I went to my Dad's . . . Carl Coffey never did say he had any difficulty or altercation with Oliver. He seemed to be drinking pretty heavy. The place he showed me on his leg, blood had been flowing from it but not flowing at the time. Carl Coffey had some scratches on his forehead and one side of his nose. I do not remember that he said how they got there."
Mrs. Eldridge Cannon gave similar testimony. She also stated that defendant said "Mr. Oliver was watching some whiskey"; that after defendant left their home the second time, he came back in probably ten minutes and got his gun, which he had left, and asked her for his hat . . . "He only mentioned Clark's name other than Oliver's. He said it was Clark's liquor."
When officers arrested defendant about 8 o'clock on the morning the body of Tom Oliver was found, he told them that he had some liquor covered up over in the woods and when he went to get it "some s.o.b. shot him, but that he did not know who it was . . . All he said was some s.o.b. shot him." Later, upon being asked to tell everything that occurred from the time he ate dinner the day before, until the time the officers came to his house, defendant said that in the middle of the afternoon of Tuesday, April 22nd, he left home and went to his mail box across the road; that he carried his small ax and was going to chop a few sticks of wood or brush or something; that seeing some cases of something stacked up out in the woods, he stepped out there about 15 or 20 steps, where he could read the words "Schenley Whiskey"; that he was looking at that, and about that time somebody fired a gun and shot him in the leg and almost knocked him down and scared him; that the shot came down through the woods towards Oliver's home, or the other way; that he went home and his wife was not there, and he went up to Mr. Cannon's and told him that someone had shot him and wanted him to get the doctor and to get the Law — that if he would take him he would tell the officers and get them to come out there for the whiskey; but that Cannon did not take him; and he and his wife went up and spent the night at home. Later defendant told the same officer that he had been working on his road, and two men came along and stopped and talked to him, and he worked until late, about 6 o'clock; that Oliver had been working some for him, plowing or something, a few days before, and he had not paid him, and he thought he would go out and pay Oliver, and went to the mail box and walked on out towards Oliver's house, and when he got to the edge of the field, he saw Oliver's wagon out to the left, and did not see anybody out there but saw the whiskey or something out there and started that way and somebody shot him; that he did not see Oliver in the woods on Tuesday the 22nd, — did not see anybody; that it had been two or three days since he had seen Oliver, — said this a number *Page 125 
of times; and that he went home and he and his wife spent the night at home.
When arrested the officers testified: "Carl was drinking; he appeared to be under the influence of whiskey, and in a very nervous condition," and "had the odor of whiskey on his breath," — though he said he had not drunk any whiskey in about four months. The officers also testified that when asked how he got the skinned place on his head and face, defendant said "he didn't know," and said, "I have been shot too," and showed a place on his leg that looked like it had been made by a No. 6 shot; and that later, defendant said that he fell down, or ran into a tree when somebody shot him.
The officers also testified that defendant had some blood on his pants where he was shot, down on that leg, half way between his ankle and his knee, some also on the right leg, "about even with the leg up in front," and a spot on the right sleeve between elbow and shoulder of the leather jacket he said he was wearing the day or night before.
One of the officers testified that later he searched the woods and all around for signs of shotgun shot in the timber, but did not find any.
Also there was evidence tending to show that Tom Oliver was about 50 or 60 years of age, and would weigh about 150 to 170 pounds, and that defendant was 42 years of age, about six feet tall and would weigh 200 or maybe 210 pounds.
The State also offered, as a witness, a special agent of the State Bureau of Investigation, who testified, that he "had a talk with Carl Coffey in the Sheriff's office last Friday." What Coffey said is not shown.
At the close of State's evidence, defendant reserved exception to the denial of his motion for judgment as of nonsuit. And thereupon defendant rested his case, and renewed motion for judgment as of nonsuit — to the denial of which he excepts.
Verdict: "Guilty of murder, second degree."
Judgment: Confinement in the State Prison at Raleigh for a term of not less than twenty (20) years nor more than twenty-five (25) years.
Defendant appeals therefrom to the Supreme Court and assigns error.
Here the defendant stresses for error, in the main, and properly so, the refusal of the court below to grant his motion for judgment of nonsuit. G. S., 15-173. *Page 126 
A careful consideration of the evidence in the record of case on appeal, narrated above, taken in the light most favorable to the State, leads to the conclusion as a matter of law that the evidence is insufficient to support a verdict of guilty on the charge against defendant as set out in the bill of indictment. There is no direct evidence to connect defendant with the commission of the crime. The evidence offered is circumstantial, conjectural and speculative. All that is shown may be true, and defendant be innocent of the crime. Hence, the motions of defendant for judgment of nonsuit should have been sustained.
In passing upon the legal sufficiency of the evidence, it must be borne in mind that when the State relies upon circumstantial evidence for a conviction of a felony, as in this case, "the rule is that the facts established or advanced on the hearing must be of such a nature and so connected or related as to point unerringly to the defendant's guilt and exclude any other reasonable hypothesis," Stacy, C. J., in S. v. Harvey,ante, 62, citing S. v. Stiwinter, 211 N.C. 278, 189 S.E. 868; S. v.Matthews, 66 N.C. 106. The evidence in its entirety tends to show no more than that defendant had the opportunity to commit the crime. And evidence of opportunity standing alone will not justify a finding that the act was done by the defendant. It is only a circumstance to be considered along with other evidence in the case. Stansbury on The North Carolina Law of Evidence, Sec. 84, P. 157. S. v. Woodell, 211 N.C. 635, 191 S.E. 334. See also S. v. Jones, 215 N.C. 660, 2 S.E.2d 867.
The statement of defendant made to witness Cannon, and offered in evidence by the State, tends to put him at the scene of the crime, but it does more, it tends to exculpate him. While the State, by offering in evidence a statement of defendant in a criminal action, is not precluded from showing that the facts were different, no such evidence tending to identify the defendant as the culprit was offered in the present case, and in this respect the State's case is made to rest entirely on the statement of the defendant, which the State presented as worthy of belief. S. v.Todd, 222 N.C. 346, 23 S.E.2d 47; see also S. v. Fulcher, 184 N.C. 663,113 S.E. 769; S. v. Cohoon, 206 N.C. 388, 174 S.E. 91; S. v.Baker, 222 N.C. 428, 23 S.E.2d 340; S. v. Boyd, 223 N.C. 79,25 S.E.2d 456; S. v. Watts, 224 N.C. 771, 32 S.E.2d 348.
The statement made by defendant to Cannon, considered as worthy of belief, tends to show that others were there, and that "they" shot not only defendant, but that they shot deceased. The evidence is clear that defendant was shot, and the record is devoid of evidence that there were no gunshot wounds on the body of deceased. The evidence of the doctor is confined to wounds on the head of deceased sufficient in his opinion to cause death. Moreover, there is other evidence from which it appears, or *Page 127 
may be inferred that others were at the scene during the twenty-four hours preceding the finding of Oliver mortally wounded. According to his adult daughter, there was a person around the house that day, but not close enough to be recognized by her. Indeed, as we read her testimony, she says that when she, with her sister, went to call their father to supper, there was "more than one person" out there, but just one man with him. Moreover, the statement of defendant, offered in evidence by the State, is that the large quantity of whiskey described in the evidence was not the property of Tom Oliver, but of one Clark. Such a large quantity of whiskey in a dry territory under the circumstances detailed, leads to the inference that it was there for sale. And the fact that there were 20 to 25 cases on the wagon Monday night, and 30 to 40 cases according to defendant's statement to Cannon, offered in evidence by the State, and only 18 to 20 there Wednesday morning, it may be inferred that there had been sales made of the difference, and, if sales were made, it may be inferred that they were made at that place. The fact that several cases were broken open leads to inference that sales were made in less than case lots. If there were sales, it may be inferred that the fact that whiskey was there would have become known to others in the community and along the highway, and the difference in quantity may be accounted for even by hijacking. The fact that Oliver had his gun out there indicates he though he might have occasion to use it. And from the fact that there was an empty shell in it Wednesday morning, it may be inferred that he had used it.
Moreover, the blood spots seen on the legs of defendant's pants and on his leather coat sleeve are entirely accordant with his innocence. The State offered proof that defendant told Cannon that he was shot in the leg, and that Cannon had defendant pull up his pants' leg to show the wound, and that the leg had been bleeding. From this it may be inferred that defendant had previously pulled up his pants' leg to see and had seen the wound, and had gotten blood on his left hand, and had transmitted the blood from his left hand to his right sleeve, — in a perfectly natural way.
Furthermore, the evidence offered fails to show any motive for defendant to have killed Oliver. While not necessary to be proven, motive or the absence of motive is a circumstance to be considered. Oliver and defendant were neighbors. Defendant for some time had bought milk from the Olivers, and had been to the house to pay for it, and was known to the Oliver family. Oliver had previously plowed for defendant. They were together in the afternoon, sitting in the words, and drinking together. And, while the little girl says she heard her father crying, before he came to supper, and defendant laughing, it is strange that there is no evidence that he appeared to have been crying when he came to supper. *Page 128 
The contradictory statements made by defendant to the officers when and after he was arrested, may point a finger of suspicion at him, but "The circumstances" here, as stated by Devin, J., in S. v. Penry, 220 N.C. 248,17 S.E.2d 4, "may have been such as to excite suspicion, but the evidence does not exclude the rational conclusion that some other person may have been the guilty party," citing S. v. Prince, 182 N.C. 788,108 S.E. 330; S. v. English, 214 N.C. 564, 199 S.E. 920; S. v. Shu,218 N.C. 387, 11 S.E.2d 155. See also S. v. Goodson, 107 N.C. 798,12 S.E. 329.
The defendant's motion for judgment of nonsuit will be sustained here, G.S., 15-173, and judgment below is
Reversed.