For the reasons stated the judgment below is

Affirmed.

———————

## STATE v. CARRIE GREEN HENDRICK.

(Filed 11 October, 1950.)

**1. Homicide § 3—**

A murder which is perpetrated by means of poison is murder in the first degree. G.S. 14-17.

**2. Homicide § 16—**

In a prosecution for murder by means of poison, the burden is on the State to prove beyond a reasonable doubt that the deceased died from poison and that defendant administered the poison with criminal intent.

**3. Criminal Law § 52a (1)—**

Upon motion to nonsuit, the evidence is to be taken in the light most favorable to the State. G.S. 15-173.

**4. Criminal Law § 52a (3)—**

Circumstantial evidence must be so connected or related as to point unerringly to defendant's guilt and to exclude any other reasonable hypothesis in order to be sufficient to sustain conviction, and such evidence which is merely conjectural and speculative and which, though true, is consistent with innocence of the defendant, is insufficient to be submitted to the jury.

**5. Same: Homicide §§ 20, 25—**

While evidence of motive is competent to be considered by the jury as a circumstance tending to identify the accused as the perpetrator of the offense, such evidence alone is insufficient to sustain a conviction.

**6. Homicide § 20—**

Solicitude of deceased's widow immediately after his death as to insurance on his life of which she was beneficiary *is held* not a circumstance tending to show that she poisoned him under the facts of this case, it appearing that the policies were in a small amount, that the widow selected a casket for her husband, and that her interest in the insurance may have been a natural concern about funeral expenses and in entire harmony with the hypothesis of her innocence.

STATE *v.* HENDRICK.

**7. Same—**

In order for a marriage certificate to be competent as a circumstance tending to show that defendant killed her husband in order to remarry, it must be shown that defendant and the person named in the certificate are the same.

**8. Homicide § 25—**

Evidence that defendant had an opportunity to commit the offense is a circumstance to be considered by the jury along with other evidence of guilt, but is insufficient standing alone to show that the act was done by defendant.

**9. Criminal Law § 34e—**

In order for defendant's silence in the face of an accusation of guilt to be competent as an implied admission, the record must show what the defendant said or did at the time.

**10. Same—**

Testimony not objected to tending to show that while suffering from arsenic poisoning, defendant's husband made a statement late at night some three hours prior to his death in the presence of his wife to the effect that she was the cause of his suffering, and that his wife made no reply but turned around and went downstairs, while a circumstance to be considered by the jury for what it is worth, *it is held* doubtful whether the attending circumstances called for a denial, and *held further*, its weight as an implied admission that she administered poison to him is rendered attenuate by the fact that at the time of the accusation there had been no suggestion that the husband was suffering from poisoning.

**11. Criminal Law § 42f—**

Where the State introduces testimony of a statement of the defendant to the sheriff, it thereby presents it as worthy of belief, and defendant is entitled to the benefit of any exculpatory statements contained therein, although the State is at liberty to show that the facts were otherwise.

**12. Criminal Law § 33: Homicide § 25—**

Testimony of a statement made by defendant to the sheriff which is entirely consistent with defendant's contention that she did not administer poison to her husband is not a confession of guilt and is insufficient evidence to overrule defendant's motion to nonsuit.

APPEAL by defendant from *Burgwyn, Special Judge,* at May Term, 1950, of WARREN.

Criminal prosecution upon a bill of indictment charging that defendant, with force and arms at and in Warren County, unlawfully, willfully and feloniously and of malice aforethought, did kill and murder one Henry Green against the form of the statute in such case made and provided, etc.

Upon arraignment, defendant pleaded not guilty.

Upon trial in Superior Court the State offered evidence tending to show substantially these facts: Henry Green, the deceased, and his wife, the defendant, Negroes, lived at his home about seven miles from Warrenton, N. C. He was taken sick on Monday, and died there at 3:15 a.m., on the next Saturday, 18 March, 1950.

The body of deceased was taken first to a funeral home and then to Duke Hospital at Durham, N. C., where an autopsy was performed, and toxicological examination made. Arsenic was found in the hair, urine, gastric or stomach content, and liver. From these findings there is expert opinion evidence that the death of deceased was caused by arsenic poisoning.

Dr. Taylor, the toxicologist, who made the examination, testified in substance that arsenic, found in the hair, indicates that deceased had arsenic in his system, maybe a large dose at some previous time, or maybe in small doses over a period of time; that arsenic in the hair is in inactive form; but that arsenic found in the urine, or gastric content, or liver, or kidneys is in active form.

Dr. Taylor also testified that "arsenic is a metal, and from it you get various types of preparations containing arsenic, which preparations are used commercially and medicinally"; that "arsenic compounds are used in various chemical preparations as medicine, to be prescribed for certain diseases"; and that "people can acquire arsenic poisoning in various and sundry ways: Through absorption in dealing with chemicals that contain arsenic; through food adulteration provided the food contains arsenic"; that "numerous persons die as a result of being accidentally poisoned by eating substances that contain arsenic."

The State offered testimony of other witnesses. Joe Green testified in pertinent part: "I live in Warrenton. Henry Green was my brother. He died . . . at his home . . . Nobody lived there with him but his wife, Carrie Lee Green, the defendant here in court in this case. I know what they say her name is now . . . I was with my brother in his last sickness from the time he got sick until the time he died. He was taken sick on a Monday and I went to his house on the following Wednesday. His wife was there. She went to the bed where he was and he said to her in my presence, 'Go back, my brother will do what is to be done; I don't want you to do anything else for you are the cause of my suffering like this.' He said that on Wednesday morning between 9 and 10 o'clock when I first got there . . . He asked would I take him to the doctor and I said 'Yes.' His wife said, 'You are not going to take him out of here'; he said that in the day of Thursday and I took him to the doctor that day. I stayed there until 1 o'clock on Thursday night . . . I went back on Friday and when I got there he was laying there on the bed suffering right bad, and he told me to do what I could for him. His wife was

15—232

present when he told me that. He said in her presence he did not want her to do anything else because she was the reason he was suffering in that shape, and he did not eat anything else she fixed. When he said that his wife did not say anything, just turned around and went downstairs. My brother lived about three or three and a half hours after he made that statement in her presence. After that Carrie Green did not come back in the room where my brother was at any time. As near as I can recall the next time I saw Carrie Green was at 2:15 on Friday night . . . At that time she was downstairs laying down on the daybed, and I . . . asked would she loan me the car, or let one of the boys take the car and go for my brother who lives at Hicks' Grove five miles from there, and she said, 'No, I will go,' and she went . . . My brother died at 3:15 and she come in about three minutes after that. I met Carrie in the door as she come in and told her he was dead. She said 'You don't tell me he is dead.' She commenced looking for her insurance papers, and that is all she said. She just said, 'Where are my insurance papers. I had them here looking at them yesterday.' That is all she said . . . when she asked about the insurance papers she was standing in the house looking in the drawer. I saw her when she found the papers. She put them in her pocketbook, and after the undertaker came, me and her came to town. She said she could not stay there, and brought the insurance policies with her—and we left about 8 o'clock for Henderson. Carrie Green had the insurance papers at that time. She said she was going to her sister's house."

The witness continued on cross-examination: ". . . On Thursday before my brother died . . . Carrie Green and I went with my brother to Dr. Peate's office here in Warrenton, and he was examined by Dr. Peate in his office. His wife was present at the time. The doctor said he had a bad stomach and gave him some medicine. On that same day, Thursday, Carrie Green had absolutely told me she was not going to take my brother to a doctor. I did not take my brother in an automobile to South Hill, Va., to see a root doctor on Friday. Carrie Green is the one that carried him and asked me to go to South Hill with her, but did not go to a root doctor. He asked me would I go with him, that he knew a fellow he thought would do him some good if he had a bad stomach . . . I don't know whether the person my brother went to see in South Hill on Friday was a doctor or not, but he just asked me to go with him. I know Carrie Green did come in the house on Saturday morning and start to looking for insurance papers when I told her Henry was dead. She did not faint and did not shed a tear, but just asked for the insurance policies."

Then under examination by the court, the witness continued: "That day after my brother died I went to Henderson with his wife; she said

she wanted me to go with her to see about his insurance. She went to see some insurance man . . . He just said the premium on the policy was due on Monday after he died and she thought my brother was behind in his premiums but it was not due until the following Monday."

Then on re-direct examination the witness testified: "I do not know who paid the premium just before my brother died. I paid the one that Saturday morning after he died . . . Carrie, a brother of mine and myself were present when I paid it."

Sheriff Roy V. Shearin testified: That in response to a message which he received, he went to the jail to see Carrie Green, and had a conversation with her, as follows: ". . . I asked her what did she send for me for and she said she wanted to talk to me and wanted to get a lawyer. I said 'What have you got to tell me?' She said, 'Henry Green brought some powder out to her house and put it on her icebox and told her not to bother it.' She said, 'I did not know what it was so I put it in the stove and burned it up.' That on Wednesday morning before Henry died on Saturday he brought something there in a bottle that looked like a vanilla bottle and said, 'Here is some soup flavoring to make soup taste better.' She said he started to pour some of it in her soup and she took it away from him and poured a teaspoon of it in his soup. I asked her if she did not know what she poured in his soup and she said she did not know what it was. I said, 'You are the only one who was cooking for Henry, don't you know you should not put anything in his soup you did not know what it was.' I asked Carrie why she did not put some of it in hers, and she said, 'If I had put it in mine I would have been where he is.' I told her, 'Then you would have been dead like he is.' I said to her, 'Don't you know you have told enough to convict you?' She said, 'I know I have and I am going to ask the mercy of the court.' "

The sheriff further testified, that defendant told him that she threw the bottle out in the yard; that possibly a week after the death of deceased, he took defendant to her home, where she searched for the bottle she had thrown in the yard; that Solicitor Tyler was with him; that she found a lot of medicine bottles, and one with "Poison" on it; that he, the sheriff, found some of the bottles, and Mr. Tyler found some; that she said that at the time of the death of her husband the bottles were in her home,—that she stood in her door and threw all the medicine in bottles out in the yard one at a time,—said after Henry died she took all of these bottles to the back door, stood in the back door or on the step, and threw them in the back yard, one at a time; and that he, the sheriff, put all the bottles in a bucket and brought them to jail.

Then on cross-examination the sheriff testified in pertinent part: "Q. You did testify Carrie Green told you her husband brought the bottles home? A. Yes, and it looked like a vanilla bottle. Q. And that he put

some of it in her soup? A. No, that he started to put some of it in her soup and she took it and put it in his. Q. And he drank the soup? A. Yes. . . . Q. She has told every time you discussed the case with her that she did not poison her husband? A. Yes, she told me that."

Following the testimony of the sheriff and of the jailer, as to the custody of them, bottles in a bucket were offered in evidence.

The assistant undertaker testified that he accompanied John Robinson to get the body; that Carrie Green was at the house where they got the body on Saturday morning at 4:30; that she told them the name of the deceased was Henry Green, her husband; that they brought the body away from there and brought it to Green Funeral Home; that later the same day he went to Dr. Peate to get a death certificate; that he signed it and he, the witness, took it to the Registrar in the county for the township; that he went to Dr. Peate because Carrie Green said he was his doctor, his last attending physician; and that he was at the funeral home when the defendant selected the casket for her husband.

The State also offered in evidence two policies of insurance on the life of Henry Green, one in the amount of $315.00 and the other in the amount of $180.00, in both of which Carrie Green is named as the beneficiary.

And J. S. Wrenn of Emporia, Va., testified that he is clerk of court, and keeper of records of marriage certificates, and performs marriage ceremonies; that he has the original marriage certificate, and a duplicate of it, issued to one Joe Hendrick and Carol Williams Green; and also the original, and an exact duplicate of the application for the marriage license; and that he performed the marriage ceremony on 31 March, 1950.

Defendant offered no evidence, but in apt time made, and renewed motions for judgment as of nonsuit, and for a directed verdict of not guilty as to the charge of murder in the first degree, or any other charge in the bill of indictment. The motions were overruled, and defendant in apt time excepted.

Verdict: Guilty of murder in the first degree with recommendation of life imprisonment.

Judgment: Confinement in the State Prison for the term of her natural life.

Defendant appeals therefrom to Supreme Court, and assigns error.

*Attorney-General McMullan and Assistant Attorney-General Rhodes for the State.*

*Carl E. Gaddy, Jr., and Ray B. Brady for defendant, appellant.*

WINBORNE, J. While the record on this appeal presents numerous assignments of error based on exceptions to the admission of evidence,

the one based upon the denial of defendant's motion for judgment as of nonsuit under G.S. 15-173 is considered determinative of the appeal. Hence, others will not be considered and treated.

A murder which is perpetrated by means of poison is deemed to be murder in the first degree. G.S. 14-17. And when the State undertakes to prosecute for such a murder, it has the burden of producing sufficient evidence to prove beyond a reasonable doubt (1) that the deceased diẽd by virtue of a criminal act, and (2) that such criminal act was committed by the accused. *S. v. Palmer,* 230 N.C. 205, 52 S.E. 2d 908, and cases cited. In other words, the State, in such case, and in this case, has the burden of producing sufficient evidence to prove beyond a reasonable doubt that the deceased died from poison, administered with criminal intent by the person charged.

When the sufficiency of the evidence offered on the trial in Superior Court is challenged by motion for judgment as of nonsuit under G.S. 15-173, the evidence is to be taken in the light most favorable to the State.

Applying this rule to the evidence in the case in hand, it may be conceded that there is sufficient competent evidence to show, and from which the jury may find beyond a reasonable doubt that the deceased died of arsenic poisoning. But a careful consideration of the evidence in the record of case on appeal, narrated above, taken in the light most favorable to the State, leads to the conclusion as a matter of law that it is insufficient to support a finding beyond a reasonable doubt that the deceased died from criminal act, or that the poison was administered by defendant with criminal intent, or to support a verdict against her on the charge contained in the bill of indictment. The evidence offered is conjectural and speculative. All that is shown may be true, and the defendant be innocent of the crime. Hence the motions of defendant for judgment as of nonsuit should have been sustained. *S. v. Coffey,* 228 N.C. 119, 44 S.E. 2d 886. Nevertheless, consideration of the various contentions of the State follows:

In passing upon the legal sufficiency of the evidence, when the State relies upon circumstantial evidence for a conviction of a felony, as in the present case, "the rule is that the facts established or advanced on the hearing must be of such a nature and so connected or related as to point unerringly to the defendant's guilt and to exclude any other reasonable hypothesis." *S. v. Stiwinter,* 211 N.C. 278, 189 S.E. 868; *S. v. Harvey,* 228 N.C. 62, 44 S.E. 2d 472; *S. v. Coffey, supra; S. v. Minton,* 228 N.C. 518, 46 S.E. 2d 296; *S. v. Frye,* 229 N.C. 581, 50 S.E. 2d 895; *S. v. Fulk, ante,* 118, 59 S.E. 2d 617.

The State contends that defendant had two motives for killing her husband: (1) To obtain the proceeds of two policies of insurance on his

life in which she was named beneficiary, and (2) to be free to marry one Hendrick.

"Evidence of motive is relevant as a circumstance to identify the accused as the perpetrator of an offense, . . . but such evidence, standing alone, is not sufficient to carry a case to the jury, or to sustain a conviction," *Ervin, J., in S. v. Palmer, supra.*

As to the first alleged motive: The State points to the testimony tending to show her early solicitude as to the insurance after the death of her husband. This, however, is in entire harmony with her innocence. The evidence tends to show that there was some uncertainty as to whether the premium was paid. Indeed, the brothers of deceased manifested some interest, even to the extent of going with her to see the insurance agent in Henderson, N. C., and of one of them paying a premium that did not become due until two days after the death of the insured. Moreover, the evidence shows that defendant selected the casket for her husband. And it is entirely reasonable that her interest in the insurance was a natural concern about funeral expenses.

And as to the second: While the record shows the testimony of the witness J. S. Wrenn, of Emporia, Virginia, that he performed a marriage ceremony between one Joe Hendrick and Carol Williams Green on 31 March, 1950, the record is void of any evidence that the Carol Williams Green who participated in that marriage ceremony is the defendant, who is referred to in the evidence as Carrie Green or Carrie Lee Green.

The State also contends that defendant only had an opportunity to administer the poison to her husband. Evidence of opportunity standing alone will not justify a finding that the act was done by defendant. It is only a circumstance to be considered along with other evidence in the case. Stansbury on North Carolina Law of Evidence, Sec. 84, page 157. *S. v. Woodell,* 211 N.C. 635, 191 S.E. 334. See also *S. v. Jones,* 215 N.C. 660, 2 S.E. 2d 857; and *S. v. Coffey, supra.*

Also it is contended by the State that the silence and conduct of defendant when her husband stated to her "You are the cause of my suffering like this," and later repeated, constitute an admission by adoption that she administered the poison from which he later died. In this connection the record discloses that the clause quoted is a part of a statement attributed to the husband on Wednesday morning after his brother arrived; but the record fails to show what his wife said or did at the time. The second statement, the record discloses, was made Friday night three or three and a half hours prior to the time of the husband's death at 3:15 Saturday morning. It must, therefore, have been near midnight. At that time the testimony is that the husband "said in her presence he did not want her to do anything else because she was the reason he was

suffering in that shape," and that "when he said that his wife did not say anything, just turned around and went downstairs." All this testimony was received in evidence without objection, and may be considered as a circumstance for what it is worth. *S. v. Hawkins,* 214 N.C. 326, 199 S.E. 284. ˙ Nevertheless, under decisions of this Court, it may be fairly doubted that the attending circumstances were such as to call for a denial by her if what her husband said were not true. *S. v. Jackson,* 150 N.C. 831, 64 S.E. 376; *S. v. Wilson,* 205 N.C. 376, 171 S.E. 338; *S. v. Hawkins, supra; S. v. Gentry,* 228 N.C. 643, 46 S.E. 2d 863; *S. v. Rich,* 231 N.C. 696, 58 S.E. 2d 717.

In *S. v. Wilson, supra,* it is said : "When a statement is made, either to a person or within his hearing, implicating him in the commission of a crime to which he makes no reply, the natural inference is that the implication is perhaps well founded, or he would have repelled it. *S. v. Suggs,* 89 N.C. 527. But the occasion must be such as to call for a reply. 'It is not sufficient that the statement was made in the presence of the defendant against whom it is sought to be used, even though he remain silent; but it is further necessary that the circumstances should have been such as to call for a denial on his part, and to afford him an opportunity to make it.' 16 C.J. 659.

"Silence alone, in the face or hearing of an accusation, is not what makes it evidence of probative value, but the occasion, colored by the conduct of the accused or some circumstance in connection with the charge, is what gives the statement evidentiary weight. *S. v. Burton,* 94 N.C. 947; *S. v. Bowman,* 80 N.C. 432."

"The general rule is that statements made to or in the presence and hearing of a person, accusing him of the commission of or complicity in a crime, are, when not denied, admissible in evidence against him as warranting an inference of the truth of such statements." *S. v. Hawkins, supra.*

The cases of *S. v. Spencer,* 176 N.C. 709, 97 S.E. 155; *S. v. Walton,* 172 N.C. 931, 90 S.E. 518, and *Reid v. Barnhart,* 54 N.C. 142, cited and relied upon by the Attorney-General, are not in conflict with the above.

In the light of these principles, it is noted that in the case in hand, there had been no suggestion that the husband was suffering from poison, —rather he had been told on Thursday by his physician that he had "a bad stomach." And on Friday he had gone to South Hill, Va., to see a man there "he thought would do him some good if he had a bad stomach." Moreover, the record fails to show any intimation that at that time defendant was charged with any criminal act.

The State contends that the element of the offense, criminal administration of poison, is borne out by the statement made by defendant to

the sheriff, which in the brief of the Attorney-General is characterized as "defendant's confession" that she "poured a teaspoon of it in his soup." This contention overlooks two salient factors: In the first place, there is no evidence that poison was in the bottle. While the evidence shows that medicine bottles, one of which was marked 'Poison,' were found in the yard, where defendant says she threw "all the medicine in bottles," there is no evidence that any of these bottles contained poison, or showed any trace of poison.

In the second place, the State offered in evidence the statement of defendant to the sheriff, and thereby presents it as worthy of belief. *S. v. Todd,* 222 N.C. 346, 23 S.E. 2d 47. See also *S. v. Fulcher,* 184 N.C. 663, 113 S.E. 769; *S. v. Cohoon,* 206 N.C. 388, 174 S.E. 91; *S. v. Baker,* 222 N.C. 428, 23 S.E. 2d 340; *S. v. Boyd,* 223 N.C. 79, 25 S.E. 2d 456; *S. v. Watts,* 224 N.C. 771, 32 S.E. 2d 348; *S. v. Coffey, supra;* *S. v. Robinson,* 229 N.C. 647, 50 S.E. 2d 740.

And the statement exculpates defendant of any knowledge that the bottle from which she poured a teaspoon of its contents into the soup of her husband contained poison. Her statement is that her husband obtained the bottle, and she did not know what it contained. In *S. v. Robinson, supra, Barnhill, J.,* writing for the Court, said: "When the State offers evidence which tends to exculpate the defendant, he is entitled to whatever advantage the testimony affords, and so, when it is wholly exculpatory, he is entitled to his acquittal."

This principle, however, does not preclude the State from showing that the facts were different. *S. v. Todd, supra; S. v. Fulcher, supra; S. v. Cohoon, supra; S. v. Baker, supra; S. v. Boyd, supra; S. v. Watts, supra; S. v. Coffey, supra; S. v. Robinson, supra.* But in the present case the State has failed to show the facts to be different.

The portion of the dialogue between the sheriff and defendant attributed to defendant, "If I had put it in mine I would have been where he is," in retrospect, is entirely consistent with innocence. Poison had been found in the internal organs of her husband, and it is reasonable that she may have presumed that the bottle he had obtained contained poison.

Furthermore, what defendant said in response to the suggestion of the sheriff that she had told enough to convict her,—when considered with her entire statement to the sheriff, is far from an admission that she was guilty of the criminal administration of poison to her husband.

At most it may be said that the evidence shown in the record may point a finger of suspicion against defendant. Yet it lacks sufficient probative value to support the verdict against her. It is entirely consistent with her innocence. "It is better that ten guilty persons escape than that one innocent suffer."

Hence, judgment from which this appeal is taken, is Reversed.